United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Cajule Cedant, Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 19-24877-Civ-Scola |
| United States of America, | ) |
| Defendant. | ) |

### Verdict and Order Following Non-Jury Trial

In this Federal Torts Claims Act ("FTCA") case, the Plaintiff Cajule Cedant brings one count of negligence against the Defendant, United States of America, alleging that the negligence of United States Postal Service ("USPS") driver Elijah Miller caused Cedant significant injuries. (ECF No. 1 ¶¶ 9-13.) Cedant seeks monetary damages for past and future medical expenses, as well as for past and future pain and suffering and loss of enjoyment of life. (ECF No. 97 at 10.) Cedant is not seeking damages for lost wages. Recently, the Court denied the United States' *Daubert* motion seeking to exclude Cedant's experts and its motion for summary judgment. (Omnibus Order, ECF No. 100).

The Court held a two-day, non-jury trial, beginning on August 26, 2024, and ending on August 28, 2024.[1] Prior to the trial, the parties submitted a joint pretrial stipulation (ECF No. 95), as well as their proposed findings of fact and conclusions of law. (ECF Nos. 93, 97.) The Court has carefully reviewed these submissions.

After considering the credible testimony and evidence, and the applicable law, the Court finds that the negligence of the United States caused permanent injuries to Cedant and that Cedant is entitled to damages for those injuries.

The Court's findings of fact and conclusions of law are set forth below.

### 1. Findings of Fact

On December 11, 2017, a USPS vehicle ran a stop sign and crashed into the side of another vehicle in which Cedant was a front seat passenger. The undisputed evidence established that the United States was negligent, and the negligence was the sole cause of the automobile accident. The Court granted a partial judgment as a matter of law finding that the United States had a duty of care and breached that duty. The remaining factual disputes are (1) whether Cedant's claimed injuries were caused by the accident, (2) whether any injuries

---

[1] Trial was not held on Tuesday, August 27, 2024.

he sustained as a result of the accident were permanent, and (3) the amount of damages, if any, that should be awarded to Cedant.

Cajule Cedant is 55 years old, was born in Haiti, and has lived in the United States for 25 years. He has two children, four years old and seven years old, who live with him. He has always worked as a mechanic and sometimes as a security guard.

On December 11, 2017, Cedant was a passenger in a Toyota Forerunner which was involved in an accident at the intersection of NE 11th Avenue and 138th Street. A USPS vehicle failed to stop at a stop sign and hit the passenger side of the car in which Cedant was a passenger. Cedant was wearing his seat belt at the time of the accident. The car flipped over. Cedant's body hit the body of the driver, Gelain Domingue; his back and neck hit the back of the seat; his knee hit the dashboard; and he felt his spine shake.

Cedant was able to get out of the car and then assisted Domingue in getting out of the car.

Cedant refused to go to the hospital on that day. Cedant testified that his symptoms started immediately after the accident and worsened over time. His right shoulder started to hurt right away. Cedant testified that he did not seek immediate medical treatment after the accident because he had just had a child three months earlier and did not want to alarm his family by being transported to the hospital. After he arrived at home, he started feeling pain in other areas of his body.

Three days later, the pain in his neck, lower back, shoulder and knee not only did not abate, but also had gotten worse. So, he went to a chiropractor. He chose a chiropractor because if there were bones that had moved, he felt that was the best course of action to take. He was given heat treatment, a massage, chiropractic adjustments, and exercises. The treatment by the chiropractor helped him a little bit but the pain continued.

In January and March 2018, he was referred for MRIs of his lower back, neck, shoulder and knee. After the MRIs, he saw Drs. Gomez and Katz.

Dr. Heldo Gomez is a board-certified neurosurgeon who saw Cedant in April 2018 concerning his lower back and neck. Dr. Gomez limits his practice to spinal disorders. Cedant brought his MRI images to his appointment with Dr. Gomez. The MRI showed abnormalities in the disks of the lower back and neck. Cedant had muscle spasms and tenderness in the neck and lower back as well as restrictions in his range of motion in those areas.

Dr. Gomez conducted an examination and asked several questions of Cedant to obtain his history. Cedant told him he was in a prior accident sixteen or seventeen years earlier but that he had no residual pain from the accident. Cedant told him he had neck and lower back pain from the December 2017 accident.

A car accident can cause someone who has an asymptomatic herniation to become symptomatic. Someone can have degenerative conditions in his or her spine and have no pain or symptoms until a traumatic event occurs. There are times when symptoms can develop over time and the patient may feel the effects of the accident many days after the accident.

Dr. Gomez gave Cedant an epidural steroid injection in his back. He later gave Cedant a medial branch block on July 8, 2018. Cedant had only short-term positive results from that treatment. Dr. Gomez then recommended and performed a lumbar radiofrequency ablation. Dr. Gomez then recommended an updated MRI in late July 2018. There had been remodeling of the disk, but the disk was still up against the nerve root. Dr. Gomez opines that Cedant's degenerative findings remained stable, and that his degeneration had made Cedant more vulnerable and more susceptible to injury as a result of trauma.

Dr. Gomez recommended that Cedant have a microdiscectomy of the lower back. Cedant resisted the idea of having surgery and opted to treat the symptoms conservatively.

Dr. Gomez last saw Cedant in March 2024. Cedant complained about bilateral radiating into the lower extremities. Based upon his lower back symptoms, Dr. Gomez recommended a lumbar fusion surgery.

In total, Dr. Gomez has seen Cedant thirteen times since April 2018.

Dr. Gomez opines that Cedant had asymptomatic conditions prior to the accident in question and following the December 2017 accident they became symptomatic. Dr. Gomez believes the accident was an activation of Cedant's prior conditions. Dr. Gomez also believes his treatment was medically necessary. Finally, Dr. Gomez believes Cedant suffered a permanent injury to his lower back as a result of this accident.

In April 2018, Cedant also saw Dr. Shani Katz for his shoulder and knee pain based upon a recommendation from Dr. Gomez. Dr. Katz is a board-certified orthopedic surgeon. Cedant's shoulder pain was affecting his movement and daily activities and was causing a limited range of motion and loss of strength. Cedant told Dr. Katz about the December 2017 accident. Dr. Katz conducted a physical exam and reviewed Cedant's March 27, 2018, MRI of his right shoulder. Dr. Katz found that Cedant had a torn labrum, torn rotator cuff, and bursitis. Dr. Katz testified that she would not expect to see such injuries as a result of Cedant's responsibilities as a mechanic. Dr. Katz gave Cedant pills for the pain in his shoulder, but he continued to have pain. On July 31, 2018, Dr. Katz performed an arthroscopic shoulder surgery on Cedant, which also included a rotator cuff repair. The surgery confirmed the labrum tear, cartilage damage, sprained A/C joint, impingement syndrome (bursitis) and a rotator cuff tear. Following surgery, Cedant underwent physical

therapy. After a while, his shoulder was still making noise, so Dr. Katz gave him a series of three platelet rich plasma injections.

As to Cedant's left knee, Dr. Katz noted that the July 14, 2020, MRI of the knee revealed edema in the popliteus muscle, a strain/partial tear, a 1 cm cartilage defect with small adjacent cartilage flaps in the medial third of the medial femoral condyle, joint effusion and synovitis and a small popliteal cyst. Dr. Katz also testified that she recommended a left knee arthroscopy, and the possibility of a total knee arthroplasty. Cedant's left knee had become swollen, and Dr. Katz gave him platelet rich plasma injections and recommended surgery, but Cedant did not want to have surgery since the knee swelling had gone down after the injection. The last time Cedant saw Dr. Katz was in May 2024, at which point Cedant was still complaining of right shoulder and left knee pain aggravated by his daily activities.

Dr. Katz opines that Cedant's right shoulder and left knee injuries were caused by the accident. Dr. Katz is aware of the prior accident in 2003 which caused a shoulder sprain. Dr. Katz does not believe that that injury affects her opinion because Cedant had no shoulder problems for years after that accident. Dr. Katz believes Cedant's shoulder injury is a permanent injury.

Cedant continues to have pain today. The areas that are most painful are his shoulder and lower back. When he sits, he has radiating pain down his right leg and must constantly shift his position to mitigate the pain. He also feels unsteady on his feet at times. His shoulder pain is constant, and it feels like something is rubbing in the shoulder and making noise.

Cedant continues to have knee and neck pain, but the pain is not as severe. If he squats, he cannot get up without first going onto his buttocks. Prior to this accident, Cedant never had a problem with his knee.

Cedant takes painkillers to mitigate the pain on a regular basis.

Before the accident, he was able to do engine, transmission, differential and shaft work (heavy duty mechanic work), but since the accident, he can only do oil changes and brake work. He does not earn as much money now as he did before the accident.

Cedant is unable to play with his children by picking them up and putting them in swings and throwing them in the air. He also cannot do normal household chores like using a mop. Prior to the accident, he could do all of those activities.

Cedant had been involved in several previous accidents in which he claimed he was injured, in pain, and needed medical treatment in the same areas of his body he claims were injured in this accident.

In 2000, he was in a car accident but claims he was not injured, and he does not remember going to therapy. But, in 2003, he gave a statement

indicating he injured his back and legs in the 2000 accident and saw a chiropractor.

In 2001, he was in a second car accident and claimed he suffered injuries to his back, neck and legs.

In 2003, Cedant was involved in a third car accident in which he suffered sprains in his lower back, both knees, neck, and both shoulders. He went to a chiropractor and the pain and symptoms soon went away and he had no symptoms from that accident for more than ten years prior to this accident.

Cedant incurred $192,908 in medical expenses as a result of the December 2017 accident.

Dr. Marc Kaye, a board-certified medical expert in radiology, retained as an expert by the United States. Dr. Kaye has testified in court over 100 times. After reviewing the MRI images of Cedant, Dr. Kaye opines that there is no radiological data in the images to establish there was any permanent injury as a result of the accident in question. There were tears to the rotator cuff and labrum, but Dr. Kaye believes those were degenerative and not the result of recent trauma.

Dr. John Nordt III is a board-certified orthopedic surgeon also retained as an expert by the United States. He practiced sports medicine for many years beginning in the 1980s and has focused on the spine for the past 25 years. Dr. Nordt does not believe Cedant suffered any permanent injuries as a result of this accident.

Although both Cedant's and the United States's experts were qualified to give opinions, the Court finds Cedant's experts more persuasive and finds that Cedant suffered permanent injuries to his right shoulder and lower back as a result of December 2017 accident.

### 2. Conclusions of Law

The Court has jurisdiction over this action under the FTCA. *See* 28 U.S.C. § 1346(b)(1). "The [FTCA] was 'designed to provide redress for ordinary torts [committed by the federal government] recognized by state law.'" *Stone v. United States*, 373 F.3d 1129, 1130 (11th Cir. 2004) (citation omitted). Because "the alleged tort here occurred in Florida, Florida tort law applies." *Id.*

Under Florida law, a plaintiff must show that "the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that breach caused the plaintiff to suffer damages." *Id.* (quotations and citation omitted).

The United States does not dispute that the driver of the USPS truck, acting within the scope of his employment, breached his duty to Cedant to drive reasonably when he failed to stop at a stop sign. The issues that remain

are whether Cedant's expert witnesses' opinions are admissible under *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and whether Cedant has proven the elements of causation, permanency, and damages.

### a. Admissibility of Cedant's Experts

At both trial and in its pretrial filings, the United States argues that the testimony of Cedant's experts, Drs. Gomez and Katz, are both unreliable (and therefore inadmissible) and not credible. The United States previously moved to exclude Cedant's expert opinion testimony as to causation pursuant to the requirements set forth by the Supreme Court in *Daubert*. (ECF No. 83.) The United States argues that neither of Cedant's experts have "an adequate basis or a reliable methodology to support their proposed causation opinions." (*Id.* at 7.) This Court previously denied the United States's *Daubert* motion because the case was to "be tried as a bench trial without a jury" and "[t]he Court is equipped to appropriately weigh or discount the experts' testimony." (ECF No. 100 at 4.) At the same time, the Court noted that it would "not hesitate to exclude the experts' testimony 'if it turns out not to meet the standard of reliability established by Rule 702.'" (*Id.*) (citation omitted).

Federal Rule of Evidence 702 provides a three-part inquiry for trial courts to consider prior to admitting expert testimony, that is whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in [*Daubert*, 509 U.S. 579]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011). The proponent of the expert opinion bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10. "[T]he Committee Note to the 2000 Amendments of Rule 702 expressly says that '[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).

First, the Court finds that the methodologies used by Drs. Gomez and Katz are sufficiently reliable for admission under Rule 702. The United States relies primarily on an Eleventh Circuit case, *Cooper v. Marten Transport, Ltd.*, 539 F. App'x 963 (11th Cir. 2013), to argue that Cedant's experts' methodologies are unreliable. But the doctors' methodologies are unlike those

in *Cooper*, where the Eleventh Circuit upheld the district court's finding that two experts' opinions on causation were unreliable under *Daubert*. *See* 539 F. App'x at 967. There, two experts "simply conducted physical examinations and reviewed the [Plaintiffs'] medical histories" and did not rule out other possible causes when arriving at their causation opinions—including an accident that occurred just *one year* prior to the accident at issue in that case. *Id.* The Eleventh Circuit emphasized that the experts improperly relied on a temporal relationship between the accident and the injuries in reaching their conclusions—that because the injuries manifested after the accident at issue, the accident must have caused those injuries. *Id.*

Drs. Gomez and Katz, however, do not rely on the kind of temporal relationship seen in *Cooper*. Here, Cedant's prior accidents were *fourteen*, *sixteen*, and *seventeen* years earlier, and Cedant credibly testified that his injuries and pain did not manifest until after the December 2017 accident. Moreover, Drs. Gomez and Katz ruled out other possible explanations for Cedant's injuries. Dr. Katz credibly testified that Cedant's injuries are not the type expected by simply working as a mechanic, testimony which was partially based on her observations during a surgery she performed on Cedant's right shoulder. Dr. Gomez testified that accidents over ten years prior do not explain the *type* of injuries Cedant began to suffer after the December 2017 accident. Rather, Cedant's injuries and symptoms were consistent with those that would be activated by a recent severe accident. Cedant's experts, then, do not merely rely on the "temporal relationship" between the accident and Cedant's injuries that was rejected in *Cooper*. *See id.* And because Drs. Gomez and Katz used a proper methodology, the Court is not concerned that they are Cedant's treating physicians. *See Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317 (11th Cir. 2011) (explaining that though treating physicians may "purport to provide explanations of scientific and technical information not grounded in their own observations and technical experience . . . the trial court must determine whether [such testimony] meets the standard for admissions as expert testimony").

Second, Cedant's experts were credible. They met with Cedant multiple times, took his history, reviewed imaging, and conducted physical examinations. As stated above, Dr. Katz also performed surgery on Cedant's right shoulder and saw the extent and type of injuries Cedant suffered. To the extent Cedant did not mention various other possible causes of his injuries during his examinations with Drs. Gomez and Katz, Drs. Gomez and Katz testified that, based on their experience, these other explanations posited by the United States would not have caused Cedant's present injuries.

In contrast, the United States's experts, Dr. Marc Kaye, a board-certified radiologist, and Dr. John Nordt, a board-certified orthopedic surgeon,

reviewed a deposition, photos, and Cedant's MRI images and medical records. Dr. Nordt also met with Cedant once and conducted an examination. On balance, the Court finds Cedant's expert testimony more persuasive than that of the United States. The Court concludes that Cedant proved, by a preponderance of the evidence, that his injuries were caused by the accident.

### b. Causation

Cedant must prove causation by a preponderance of the evidence—that more likely than not, the accident caused his injuries. *Tharpe v. United States*, No. 15-CV-21340-UU, 2016 WL 4217863, at *6 (S.D. Fla. Apr. 27, 2016) (Ungaro, J.). When the medical conditions alleged to have been caused by a defendant's negligence are "not readily observable," "lay testimony is legally insufficient to support a finding of causation," *Crest Products v. Louise*, 593 So. 2d 1075, 1077 (Fla. 1st DCA 1992), and expert testimony is required. *Mustafa v. United States*, No. 21029533-CIV-Lenard, 2022 WL 18023353, at *11 (S.D. Fla. Sept. 15, 2022) (Lenard, J.) (citations omitted). Because "[s]oft-tissue injuries, such as back, head, neck, hip, and shoulder injuries are not 'readily observable' medical conditions," Cedant must provide expert testimony on the issue of causation. *See id.* (citations omitted).

Moreover, "Florida law requires a fact finder to award damages if a preexisting physical condition is aggravated by an injury, or the injury activates a latent condition." *Tharpe*, 2016 WL 4217863, at *6 (citing *C.F. Hamblen v. Owens*, 172 So. 694 (Fla. 1937)). Though this rule is often discussed in the context of damages, it is relevant to the issue of causation because when there is an aggravation of an a preexisting condition by an injury, "[i]n such cases the injury is the prime cause which opens the way to and sets in motion the other cause . . . ." *C.F. Hamblen*, 172 So. at 696 (finding the defendant liable for the plaintiff's injury where the defendant's negligence reactivated a condition in the plaintiff's leg, requiring amputation); *see also Univ. Comm. Hosp. v. Martin*, 328 So. 3d 858, 861 (Fla. 2d DCA 1976) (concluding that "the defendant's negligence has proximately resulted in an aggravation of a pre-existing injury and the entire consequence cannot reasonably be divided as between several independent causes"); *Horn v. Tandem Health Care of Fla., Inc.*, 983 So. 2d 1166 (Fla. 2d DCA 2008) ("[T]he defendant's negligence is the legal cause of the injury or damage if it directly and in natural and continuous consequence produces or contributes substantially to producing the injury or damage.") (cleaned up).

As discussed above, the testimony of Cedant's experts was admissible, as well as more persuasive than the testimony of the United States's experts. Cedant had preexisting degenerative conditions and has satisfied his burden

of proving by the preponderance of the evidence that his current injuries, including his preexisting degenerative conditions, were aggravated and/or caused by the accident.

### c. Damages

"Damages are an essential element of a cause of action for negligence." *Lyle*, 558 So. 2d 1047, 1048 (Fla.1st DCA 1990). Damages include all those that "are a natural proximate, probable or direct consequence of an act, but do not include remote consequences." *See Tharpe*, 2016 WL 4217863, at *6 (S.D. Fla. Apr. 27, 2016) (citation omitted) (Ungaro, J.). Past medical expenses are limited to actual damages, while "with respect to future medical expenses, only medical expenses that are reasonably certain to occur are recoverable." *Id.* (citation omitted). "In determining the reasonableness or necessity of medical treatment, facts can be established by lay testimony in negligence actions and" therefore, medical necessity is "from '[the] perspective of [the] injured party rather than from [the] perspective of [a] medical expert." *Id.* (citation omitted). *Tharpe v. United States*, 2016 WL 4217863, at *6.

As relevant here, to recover for non-economic damages, a plaintiff must show that the negligent act caused "[p]ermanent injury within a reasonable degree of medical probability, other than scarring or disfigurement." Fla. Stat. § 627.737(2)(b).

"Florida law permits the fact finder to apportion past medical expenses attributed solely to an aggravation of a preexisting injury." *Id.* at *7 (citation omitted). Therefore, "a tortfeasor's exposure should be limited to those damages she caused unless no apportionment can be made." *Fravel v. United States*, No. 8:07-CV-979-T-MAP, 2009 WL 10671272, at *3 (M.D. Fla. Feb. 13, 2009).

In Florida, the court must reduce the amount of damages a plaintiff can recover by the amount of benefits received from collateral sources, including personal injury protection ("PIP") insurance. Fla. Stat. § 768.76(1); *Norman v. Farrow*, 880 So.2d 557, 560 (Fla. 2004). Additionally, under the FTCA, a plaintiff's recovery is limited to the sum presented during the administrative proceedings that must be brought before filing a claim in court. 28 U.S.C. § 2675(b).

As discussed above, Cedant has shown that his injuries were caused by the accident, and therefore the United States's negligence. The United States has not brought forth any affirmative defenses such as comparative negligence. Therefore, Cedant is entitled to any damages he can prove up to $2,000,000, minus the $10,000 he recovered in PIP insurance.

The Court finds that the medical bills submitted by Cedant are reasonable, necessary and attributable to the injuries Cedant suffered because of the accident. These expenses include those conditions activated by the injuries caused by the accident. The Court accepts the total medical bills of $192,908 which must be reduced by $10,000 based upon the payment of $10,000 by the PIP policy. Even though the Court found that Cedant failed to establish that his neck and knee injuries were permanent injuries, the Court does find that those injuries were caused by the accident and that the medical bills related to treatment of those injuries were reasonable, necessary and related to the accident.

Cedant's injuries are chronic, have caused him pain, and have restricted his daily activities. He has had to undergo many treatments and a surgery. The Court also finds that Cedant has established that his lower back and shoulder injuries are permanent injuries, thus entitling him to recover damages for pain and suffering and loss of enjoyment of life.

The Court finds that Cedant has failed to establish by a preponderance of the evidence the reasonable certainty of any future medical expenses. Although the Court allowed submission of letters from a surgical coordinator concerning the cost of future surgeries, there was insufficient evidence to establish that Cedant will undergo those surgeries. Cedant testified he had refused the recommended surgeries and, significantly, did not testify that he would reconsider that decision.

Taking into consideration the apportionment principles set forth in Florida law, as well as the evidence presented, the Court finds that it cannot apportion between Cedant's preexisting conditions and his current injuries. *See Hamblen*, 172 So. at 696; *Fravel*, 2009 WL 10671272, at *3. Therefore, the Court finds that Cedant is entitled to the following damages:

| | |
|---|---|
| Medical expenses incurred in the past: | $182,908 |
| Medical expenses to be incurred in the future: | $0 |
| Pain and suffering and loss of enjoyment of life in the past: | $35,000 |
| Pain and suffering and loss of enjoyment of life in the future: | $150,000 |
| Total damages: | $ 367,908 |

### 3. Conclusion

Accordingly, for the reasons set forth above, the Court enters a verdict in favor of Cedant in the amount of $367,908.

The Clerk is directed to **close** this case and any pending motions are denied as moot.

**Done and ordered** in Miami, Florida on August 30, 2024.

_____
Robert N. Scola, Jr.
United States District Judge